J-A04033-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: S.N.H. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.M.H., FATHER | |
| | No. 2421 EDA 2016 |

Appeal from the Decree June 30, 2016
in the Court of Common Pleas of Bucks County
Orphans' Court at No.: 2015-A9032

| | |
|---|---|
| IN RE: A.N.H. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.M.H., FATHER | |
| | No. 2424 EDA 2016 |

Appeal from the Decree June 30, 2016
in the Court of Common Pleas of Bucks County
Orphans' Court at No.: 2014-A9129

| | |
|---|---|
| IN RE: M.R.H. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.M.H., FATHER | |
| | No. 2425 EDA 2016 |

J-A04033-17

Appeal from the Decree June 30, 2016
in the Court of Common Pleas of Bucks County
Orphans' Court at No.: 2014-A9128

IN RE:  A.M.H.

APPEAL OF:  J.M.H., FATHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 2426 EDA 2016

Appeal from the Decree June 30, 2016
in the Court of Common Pleas of Bucks County
Orphans' Court at No.: 2014-A9127

IN RE:  L.A.H.

APPEAL OF:  J.M.H., FATHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 2427 EDA 2016

Appeal from the Decree June 30, 2016
in the Court of Common Pleas of Bucks County
Orphans' Court at No.: 2014-A9130

BEFORE:  SHOGAN, J., SOLANO, J., and PLATT, J.*

_____

* Retired Senior Judge assigned to the Superior Court.

- 2 -

MEMORANDUM BY PLATT, J.:**FILED APRIL 26, 2017**

In these consolidated appeals,[1] J.M.H. (Father),[2] appeals from the decrees of the Court of Common Pleas of Bucks County (trial court), entered June 30, 2016, that terminated his parental rights to his children: A.M.H., born in January of 2007; M.R.H.,[3] born in December of 2007; A.N.H., born in December of 2008; L.A.H., born in November of 2011; and S.N.H., born in November of 2013 (Children). We affirm on the basis of the trial court opinion.

The Bucks County Office of Children, Youth and Families (CYF) filed petitions to terminate Mother's and Father's parental rights to the Children on December 26, 2014 and March 27, 2015.[4] The trial court aptly summarized the events that led CYF to file those petitions in its September 13, 2016 opinion. We direct the reader to that opinion for the facts of these cases.

_____

[1] This Court consolidated these appeals *sua sponte* on August 23, 2016.

[2] T.A.H., (Mother), has also appealed the decrees of the trial court of June 30, 2016, which terminated her parental rights as to the same five Children. We address Mother's appeal in a separate memorandum under Docket Nos. 2370, 2371, 2372, 2373, and 2374 EDA 2016.

[3] We have changed the name of M.R.H. in the caption from M.H. to M.R.H. to reflect the trial court's designation and to eliminate any possible confusion caused by different nomenclature in Mother's and Father's appeals.

[4] The December 26, 2014 petitions concerned A.M.H., M.R.H., A.N.H., and L.A.H. The March 27, 2015 petition concerned S.N.H.

The trial court held hearings on CYF's petitions on August 19, 2015, February 16, 2016, February 18, 2016, and March 11, 2016.[5]  Testifying at those hearings were CYS caseworker Desiree Mullen; the Children's maternal grandmother, D.D.; Lenape Valley Foundation caseworker, Deborah Hudson; Bucks County Counseling counselor, Richard Brown; Family Services Association parenting instructor, Joan Pfender; and Pastoral Counselor, Jill Klein.

The trial court entered its decrees terminating Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8) and (b) on June 30, 2016. Father filed his notices of appeal and statements of errors complained of on appeal July 26, 2016.  The trial court entered its opinion on September 13, 2016.  **See** Pa.R.A.P. 1925.

Father raises the following questions on appeal:

[1]. Whether the [trial] court erred in terminating Father's parental rights when the Agency failed to present clear and convincing evidence to support the statutory grounds for termination in accordance with 23 Pa.C.S.A. §[§] 2511(a)(2), (5), and (8)[?]

---

[5] The transcript of the hearing of March 11, 2016, is not part of the record. According to the trial court, it has been transcribed but it has not been entered in the record because Mother, although she ordered it, has not paid for the transcription.  We have examined the record and we find that neither Mother, in her brief, nor the trial court, in its opinions, cite to the hearing of March 11, 2016.  Accordingly, as it appears that nothing in the March 11, 2016 transcript is material to the claims of the parties, we have decided this matter without reference to it.  **See Commonwealth v. Preston**, 904 A.2d 1, 7 (Pa. Super. 2006) (*en banc*) (appellate court is limited to considering only materials in certified record when resolving an issue) (citation omitted).

2. Whether the [trial] court erred in terminating Father's parental rights when the Agency failed to present clear and convincing evidence that termination of Father's parental rights best serves the needs and welfare of the children in accordance with 23 Pa.C.S.A. §[§] 2511(a)(5), (8), and (b)[?]

(Father's Brief, at 3).

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

The trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b). In order to affirm the

termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2) and (b).

Here, the trial court concluded that termination was appropriate under Section 2511(a)(2). It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re T.F.**, 847 A.2d 738, 742 (Pa. Super. 2004) (citations omitted). Further,

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. . . .

**In the Interest of K.Z.S.**, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child, but our case law requires the evaluation of any such bond. **See In re E.M.**, 620 A.2d 481, 485 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. **See In re K.K.R.-S.**, 958 A.2d 529, 533 (Pa. Super. 2008).

We have examined the opinion entered by the trial court on September 13, 2016, in light of the record in this matter and are satisfied that the opinion provides a complete and correct analyses of Father's claims. (*See* Trial Court Opinion, 9/13/16, at 16-20 (concluding that (1) Children have lacked proper parental care and control necessary for their well-being and Father has not and cannot remedy his parental incapacitating conditions within a reasonable period; (2) Children have been in care for six months or more and reasons for placement still exist; (3) Children have been in care for at least twelve months; and (4) termination of Father's parental rights serves Children's best intersts)).

Accordingly, we affirm the decrees of the Court of Common Pleas of Bucks County that terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8) and (b) on the basis of the concise, thoughtful, and well-written opinion of the Honorable Gary B. Gilman.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/26/2017

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

| | | |
|---|---|---|
| IN RE: A.M.H. | : | NO.: 2014-A9127 |
| M.R.H. | : | 2014-A9128 |
| A.N.H. | : | 2014-A9029 |
| L.A.H. | : | 2014-A9030 |
| S.N.H. | : | 2014-A9032 |
| | : | |
| | : | |
| INVOLUNTARY TERMINATION | : | |
| OF PARENTAL RIGHTS OF J.M.H | : | |

## OPINION

### I. INTRODUCTION

J.M.H. (hereinafter "Appellant" or "Father") is the biological father of A.M.H., M.R.H., A.N.H., L.A.H., and S.N.H. (hereinafter the "Children"). Father has appealed to the Superior Court from our June 30, 2016 Decree granting the Petition filed by the Bucks County Children and Youth Social Services Agency (hereinafter referred to as the "Agency") to Involuntarily Terminate his Parental Rights.[1] Extensive evidentiary hearings were conducted on August 19, 2015, February 16, 2016, February 18, 2016 and March 11, 2016.[2]

### II. BACKGROUND

The relevant facts and procedural history of this case are as follows: A.M.H., the first child, was born to Mother on January 20, 2007, M.R.H. was born to Mother eleven months later, on December 22, 2007, A.N.H. was born to Mother on December 6, 2008, L.A.H. was born to Mother on November 19, 2011 and S.N.H., the fifth child involved in these proceedings, was born to Mother on November 8, 2013.

---

[1] T.A.H., "Mother" has also appealed our Decree of June 30, 2016 which terminated her parental rights as to the same five (5) children. Mother's appeal is addressed in a separate Opinion, filed with the Superior Court under docket 2370 EDA 2016.

[2] Due to an extended personal emergency for one of the attorneys, the originally scheduled, earlier continuation of the first evidentiary hearing had to be cancelled and rescheduled months later.

37

The Agency's initial interaction of what was to become a nine (9) year saga with the family occurred on January 31, 2007, when the first child was just eleven (11) days old. In March, 2008, the Agency removed the two (2) oldest children from their parents' care. The Children stayed in the custody of their paternal grandparents for three (3) months before being returned to their parents. In April, 2009, the 3 oldest children were removed from their parents' custody by the Bucks County Dependency Court. They were placed in foster care with their maternal grandmother, Dolores Duvak. The Children were returned to their parents in October, 2009, but were removed again by Dependency Court in August, 2010, when they were returned to their maternal grandmother's care. The Children returned to their parents in April, 2011. In February, 2013, fifteen (15) months after a fourth child had been born, all of the Children were again removed from their parents' care. The fifth child was removed from her parents' care on December 18, 2013, less than six (6) weeks after she was born.

As of the present time, all five (5) children have remained in the care of their maternal grandmother for an extensive time period. All five (5) children have been adjudicated dependent. In March 2014, the placement goal for the four (4) oldest children was changed by Dependency Court from reunification to adoption, and on March 6, 2015, Dependency Court changed the placement goal from reunification to adoption for the fifth child. On December 26, 2014, the Agency filed Petitions as to the four (4) oldest children, seeking to Terminate Parental Rights as to Father pursuant to 23 Pa. C.S. §2511 (a)(2), (5), and (8). On March 27, 2015, the Agency filed a Petition regarding the youngest child, seeking to Terminate Parental Rights as to Father pursuant to 23 Pa. C.S. §2511 (a)(2), (5), and (8). The multiple evidentiary hearings addressed the termination petitions as to all five (5) children.

III. APPELLANT'S STATEMENT OF ERRORS COMPLAINED OF ON APPEAL

Appellant filed timely Notices of Appeal on July 29, 2016.[3] The Notices of Appeal were

---

[3] The Notice of Appeal filed regarding each child is identical. No facts were elicited during the hearings which warrant separate Opinions by this Court. Therefore, we provide one Opinion regarding the Termination of Father's

2

accompanied by Concise Statements of Errors Complained of on Appeal pursuant to Pa. R.A.P. 1925 (a) (2), which we repeat, *verbatim,* as follows:

> 1. The trial court erred and abused its discretion by involuntarily terminating Father's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa. C.S. A. § 2511 (a)(2)?[sic]
>
> 2. The trial court erred and abused its discretion by involuntarily terminating Father's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa. C.S. A. § 2511 (a)(5)?[sic]
>
> 3. The trial court erred and abused its discretion by involuntarily terminating Father's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa. C.S. A. § 2511 (a)(8)?[sic]
>
> 4. The trial court erred and abused its discretion by involuntarily terminating Father's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa. C.S. A. § 2511 (b)?[sic]

## IV. STANDARD OF REVIEW

In cases involving termination of parental rights and an appeal from a decree of the trial court, the standard of review employed by the appellate courts is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, the Superior Court must accord the hearing judge's decision the same deference that would be given to a jury verdict. The Superior Court must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence. In re A.R., 125 A.3d 420, 422 (Pa.Super. 2015)(internal citations and quotations omitted).

---

Parental Rights as to all five (5) children. On August 23, 2016, the Superior Court, *sua sponte,* consolidated the Father's five (5) appeals under docket number 2421 EDA 2016.

3

"The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re M.G., 855 A.2d 68, 73–74 (Pa.Super. 2004). If competent evidence supports the trial court's findings, the Superior Court will affirm even if the record could also support the opposite result. In re A.R., 125 A.3d at 422.

## V.    DISCUSSION

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa. C.S.A. §§ 2101–2938, which requires a bifurcated analysis, as follows:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re Adoption of C.D.R., 111 A.3d 1212, 1215 (Pa. Super. 2015) citing In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here the Agency pursued termination pursuant to §2511 (a) (2), (5), and (8), which provide in pertinent part, as follows:

(a)    General rule. – The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal

4

or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

As the party seeking termination, the Agency bore the burden of establishing by clear and convincing evidence that grounds existed for terminating Father's parental rights. Clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. In re Z.P. 994 A.2d 1108, 1115-1116. (Pa. Super. 2010) (internal citations omitted).

"[T]he complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and the child." In re C.P. 901 A.2d 516, 520 (Pa. Super. 2006). "Because of the importance placed on the family unit, governmental intrusion into the family, and disruption of the parent-child relationship, is warranted only in exceptional circumstances," and "only upon a showing of clear necessity." Even when such intrusion is necessary to protect the children, every possible effort must be made to reunite the family. In addition, all circumstances must be considered when analyzing a parent's performance or non-performance of parental obligations. A parent's performance must be measured "in light of what would be expected of someone in similar circumstances." In re G.P.-R., 851 A.2d 967, 977 (Pa. Super. 2004) (internal citations omitted).

In reaching a decision following a termination proceeding, the trial court's initial focus is on the conduct of the parent and whether his or her conduct justifies termination of parental rights pursuant to the pertinent statutory provisions. In re C.L.G., 956 A.2d 999, 1004 (Pa. Super. 2008) (internal citations omitted). Only if the statutory grounds for termination are established, pursuant to §2511(a), does the welfare of the child become the court's paramount

5

consideration, and the court must reflect on whether termination will best serve the child, focusing on the developmental, physical, and emotional needs and welfare of the child. Id.

Following four days of hearings and upon carefully considering all of the testimony and evidence presented, we determined that the Agency met its burden of demonstrating clear and convincing evidence to support the termination of Father's parental rights.

The following pertinent facts were developed during the extensive evidentiary hearings held in this matter.

## A. Father, by his own admission, is unable to provide a secure and stable environment for the Children

At the evidentiary hearings, Desiree Mullen, a supervisor in the intensive services unit of the Agency, testified that she was familiar with the Agency's record regarding this family, and she has been involved as the caseworker for the parents and Children since August 2013. Ms. Mullen continued as this family's caseworker even after she transitioned, in June 2015, to a supervisory capacity within the Agency. (N.T. 8/19/15, pp. 5-6; 2/16/16, p. 10).

The Agency first became involved with the family on January 31, 2007, when the first born of the parents' 5 children was only 11 days old. Since that time, the Agency has been consistently involved with the family. (N.T. 8/19/15, p. 6; 2/26/16, p. 92).Ms. Mullen testified that some of the issues which initially prompted the Agency's involvement included Father's substance abuse, Mother's alcoholism, and ongoing domestic violence and turbulence between the parents. (N.T. 8/19/15, pp. 6-7).

Given Father's own admissions to Ms. Mullen in February 2014 and April 2014, he was not a reunification resource for the Children because he was not in a position to care for them. (N.T. 2/16/16, p. 104). Father did not contest the March 2014 goal change in Dependency Court from reunification to adoption as to the four (4) oldest children. (N.T. 2/16/16, p. 104).

Ms. Mullen testified that Father was presently unemployed and was unable to maintain housing on his own. (N.T. 8/19/15, pp. 21-22). He lives with Mother in her home despite their

6

February 2015 divorce. (N.T. 2/16/16, p. 131). Father was previously employed as a technician through Mother's business.[4] (N.T. 8/19/15, p. 21). In March of 2014, at the approximate time that a goal change hearing was to occur in Dependency Court, Mother reported to the Agency that Father was no longer employed at her business. (N.T. 8/19/15, p. 35; 2/18/16, p. 194). Father has no other source of income. He does not receive disability income, despite the serious lower back condition from which he asserts he suffers. (N.T.8/19/15, p. 21). Father does not maintain health insurance on his own; rather, his coverage is only by means of a policy for which Mother pays the premiums. (N.T. 8/19/15, p. 22; 2/18/16, p. 194).

It is apparent from the record that Father's freedom has been and continues to be constrained by Mother's control, and that he lacks the wherewithal to change or improve his status. The interpersonal dynamic of their relationship has enabled Mother to control Father's finances and housing. Indeed, Mother has monitored Father's cell-phone usage, and threatened to discontinue his health insurance. (N.T. 8/19/15, pp. 27, 59, 154-155).

Ms. Mullen testified that Father is solely dependent on Mother to meet his needs, and Father has reported to her that he is unable to live independently at this time. (N.T. 8/19/15, p. 27). When Father reported to the Agency that he desired to part ways with Mother, and take the Children with him, he was never in a position to achieve that goal. (N.T. 8/19/15, p. 27).

1.    Father's substance abuse issues

Ms. Mullen testified that while Father did not initially acknowledge to the Agency that he was abusing store-bought Ephedrine pills, which are amphetamine based, he eventually admitted that he had an addiction to those pills. (N.T. 8/19/15, pp. 18-19). Father did sign releases for the Agency to speak with his treatment providers relevant to those non-prescribed pills. (N.T. 8/19/15, p. 20). He only sporadically participated in drug treatment to address his Ephedrine addiction. (N.T.8/19/15, p. 19).

---

[4] Mother owns a water purification business which she inherited from her late Father. (N.T. 8/19/15, pp. 21-22).

7

In August 2013, the Agency received information that Father had overdosed. The Agency has still not received relevant releases to access those medical records. (N.T.8/19/15, pp. 19-20).

Father self-reported to Ms. Mullen that although he does not receive disability benefits, he is disabled due to lower back issues, for which he is prescribed pain medication. (N.T. 8/19/15, p. 21). Ms. Mullen testified that in December 2014, she "requested that [Father] sign releases for his pain medication doctor and he has yet to provide me with those signed releases despite multiple attempts to have him sign those releases." (N.T. 8/19/15, pp. 19-20, 157-158).

**2.    The continued history of accusations of domestic violence, and the instability of Father and Mother's relationship, and the resulting impact on the household, render Father unable to adequately parent the Children**

Since the Agency first became involved with this family on January 31, 2007, Father and Mother have exhibited an unstable and erratic relationship. We heard testimony of recurring accusations of domestic violence between these parents. (N.T. 8/19/15, pp. 6-7, 9). Per Ms. Mullen, "Both parents have reported domestic violence from the other partner." (N.T. 8/19/15, p. 25; 2/16/16, pp. 79-80, 93).

Ms. Mullen testified that Father has never filed for protection pursuant to the Protection from Abuse Act ("PFA") and although, on several occasions since 2007, Mother has stated that she was going to file under the Act, she has apparently never actually done so. (N.T. 8/19/15, pp. 25-26, 93).

On September 15, 2010, Mother informed an Agency caseworker that she had filed a PFA petition against Father, despite stating that there had been no physical altercation between them, and stated that she would be back in court the next morning to appear before a Judge. The next day Mother reported to the Agency that she and Father were attending marriage counseling and that she was not pursuing the PFA petition. (N.T. 2/16/16, p. 130).

The Agency has a longstanding concern about the parents' "inability to be able to deal with conflict without it spilling over into the community." (N.T. 8/19/15, p. 113). As occurred on

8

many occasions, police had been called to the home on June 25, 2010. On that date, Father accused Mother of hitting him, and Mother was found intoxicated with a .169 blood alcohol level. (N.T. 2/16/16/, p. 98).

Both parents regularly discussed the state of their marriage with the Agency. (N.T. 8/19/15, p. 23). The record is replete with examples of each parent informing the Agency of the other's blameworthy conduct. (N.T. 2/16/16/, p. 98). Father reported on multiple occasions, including in December 2013 and December 2014, that he felt "trapped" in the relationship due to Mother's controlling behaviors. He indicated that he "needs to get out" of the relationship, and that he was going to leave Mother "the next time she drinks." He insisted that he was going to file for divorce. (N.T. 8/19/15, pp. 24, 33; 2/16/16, pp. 98, 104). Mother also idly threatened divorce for many years, and she informed the Agency on various occasions that she was divorcing Father and taking the Children away from him. (N.T. 2/16/16, p. 124). Mother informed the Agency of filing for divorce in 2008, Father informed the Agency of filing for divorce in 2009, and Mother once again informed the Agency of her intent to file for divorce in May 2010. (N.T. 2/16/16, pp. 125-130).

The Agency has been justifiably concerned over the years with parents' volatile marriage. The parents have misled the Agency as to the status of their relationship, and, on occasion, as to Father's living arrangements. There were periods of time when the parents claimed that Father was living with his parents, or in the office of Mother's business. The record has revealed that those claims were sometimes inaccurate. We heard credible and persuasive testimony that the Agency was very concerned about parents' duplicitous representations. This turbulent pattern continued and ultimately, as a result of Mother's filing, parents' divorce was finalized in February, 2015. (N.T. 2/16/16, p. 130). However, Father continues to live with Mother in her home.[5] (N.T. 2/16/16, p. 131).

---

[5] The marital home was and is solely owned by [Mother].(N.T. 8/19/15, p. 26).

9

3. **Father's inability to remain compliant with reasonable Agency objectives**

Following the March 2008 adjudication of dependency as to the first two children, both parents were to participate in parenting education as well as marriage counseling. Mother was to participate in drug and alcohol treatment, and submit to a mental health evaluation. Both parents met those objectives at that time, and Court supervision was terminated on March 6, 2009. (N.T. 2/16/16, pp. 95-96). Court supervision was reinstituted just six (6) days later, on March 12, 2009, following Father's report of Mother being intoxicated, Mother stating Father was addicted to Ephedrine pills, and Mother refusing a breathalyzer test to be administered by the police. (N.T. 2/16/16, pp. 95-96). Later that year, after meeting the Agency's objectives, the Children were returned to the parents on October 9, 2009. (N.T. 2/16/16/, p. 98).

Following the June 25, 2010 incident when the police were called to the home, and Mother was found to be intoxicated with a .169 blood alcohol level, and Father accused Mother of domestic violence, the Children were returned to the care of their grandmother, Ms. Duvak. Ms. Mullen explained that the Agency's objectives for the parents to again regain custody included "that both parents participate in drug and alcohol evaluations and treatment, participate in Outreach Services, which is kind of a drug and alcohol support person for people that have addiction issues, and also participate in Lutheran Reunification Services." (N.T. 2/16/16, pp. 98-99).

The record evidenced parents' continued pattern of conduct which clearly portrayed an inability to remain compliant with Agency objectives, as explained, in part, as follows:

Ms. Mullen testified about a text message she received from Father, which she read at 7:00 a.m. on December 15, 2014. Her phone indicated that the message had been sent to her six (6) hours earlier, at 1:00 a.m. (N.T. 8/19/15, p. 58). Ms. Mullen noted that "[I]n my opinion something was critical and in crisis for [Father] to text me at one o'clock in the morning." (N.T. 8/19/15, pp. 110-111, 113). The text message read: "Please be here in the morning 7 a.m. [Mother] is drinking and going crazy. Threatening me and herself that she is going to kill herself.

10

She has also been taking pain medication and no [sic] trying to cancel my insurance because I can't get anymore. Please help." That text message prompted Ms. Mullen to visit the home that day. Upon her arrival, Father asked to speak with her privately. Father explained that he had not called the police because Mother monitors his cell phone usage. Believing it was an easier way to communicate without Mother's awareness, he contacted Ms. Mullen via text. (N.T. 8/19/15, pp. 59, 154-155). "[Father] has presented that type of information to the Agency for many years now. Of feeling, trapped, of feeling he has no ability to do something on his own. So that wasn't new information or a new indicator. He has consistently said things like that over the years." (N.T. 8/19/15, p. 115). Father explained that Mother had been drinking beer the night before, was suicidal, and was aggressive toward him. (N.T. 8/19/15, p. 58). Father believed that Mother had been taking his prescription pain medication, because his medication bottles were empty before the prescription was due to be refilled. (N.T. 8/19/15, pp. 60, 156). On December 22, 2014, when speaking with Mother about this incident, Mother denied that she had been drinking. Rather, she alleged that Father had been misusing his own prescription medications. (N.T. 8/19/15, pp. 60, 157).

On another occasion, Tammy Ashford, an Agency caseworker, testified that on February 20, 2015, Mother called her at 2:24 p. m. and cancelled a scheduled visit with the Children. Mother explained to Ms. Ashford that she had "so much going on" that she was going to inform the Children of "what's going on" and that she "had enough."[6] Neither parent provided any explanation as to why Father could not attend the scheduled visit. (N.T. 8/19/15, pp. 61-62; 2/16/16, p. 178).

After receiving concerning messages from Ms. Ashford about her exchange with Mother on February 20, 2015, Ms. Mullen proceeded to Mother's home. (N.T. 8/19/15, pp. 61-62). Ms. Mullen found no one at the home, and she was unsuccessful in her efforts to leave voice

---

[6] Ms. Ashford explained that her written reports, which caseworkers are required to submit to the Agency, include times as documented on a cell phone. (N.T. 2/16/16, pp. 183-184). The record never established what was "going on" which prompted Mother to cancel the visit.

11

messages on Mother's cell phone. Ms. Mullen left a message on the home voicemail system, and she also texted messages of concern to Mother's cell phone. Those messages were sent at approximately 3:45 p.m. (N.T. 8/19/15, pp. 61-62, 162). Between 7:30 p.m. and 7:41 p.m., Mother finally responded to Ms. Mullen with a series of unusual and cryptic text messages as follows:

> 7:30 p.m. "Are you there?"
>
> 7:36 p.m. "Not home. [Father] was not good. Can we meet first thing Monday or tomorrow?....I'm okay."
>
> 7:39 p.m. "[Father] is okay as well. We are okay. I need to talk, not now, but need to talk later. All good."
>
> 7:40 p.m. "I meant not feeling good for [Father]. We will talk.
>
> 7:41 p.m. "Still not know text is working. Problems with phone."

(N.T. 8/19/15, p. 63).

No further explanation was provided about these messages. However, the implication was that one or both of the parents were in a condition which they would not have wanted the caseworker, and perhaps others, to observe.

**B.     Father is fully beholden to Mother for his own income and housing; those needs contribute to Father's enabling of Mother's substance abuse. Father's inability to independently sustain himself contributes to his admitted inability to reasonably care for the Children.**

One of the Agency's greatest concerns was Father's "pattern of behavior of hiding [Mother's] drinking until it gets to some kind of crisis level." Father claimed that he never bought alcohol for Mother but was aware that she consumed alcohol. He explained that he wanted Mother to inform him of her drinking so that he could be present with the Children at those times. Father often stated that if Mother drank again he would leave with the Children, however, he explained that in those situations Mother has prohibited him from leaving and that is when he has called the police. (N.T. 2/16/16, p. 124).

12

While the Agency was concerned about Father's continued enabling of Mother's alcohol consumption, Father maintained that he did not need to attend a support group, that he understood the dangers of Mother's conduct, and that he did not enable her habits. (N.T. 2/16/16, p. 124.) The record evidences the exact opposite. For example, on October 22, 2014, at approximately 7:00 p.m., after having received reports about Mother's condition, Ms. Mullen, along with another Agency worker, presented for an unannounced visit at Mother's home. (N.T. 8/19/15, p. 52). Ms. Mullen requested that Mother complete a swab test at that time. Despite explaining to Mother that the Agency would consider her refusal to submit to the test as a positive result, Mother continued to state that she was not refusing, but she claimed that she did not feel well, and that she did not want Ms. Mullen and the other worker in her home. (N.T. 8/19/15, pp. 52-53, 141). Ms. Mullen estimated that they left the home at approximately 7:20 p.m.. Although it had never been stated to her while she was in the home, ten (10) minutes later, Father left a message on Ms. Mullen's office phone stating that Mother was "on a bunch of flu medication." (N.T. 8/19/15, p. 144).

Despite Father's denial to Ms. Mullen, the testimony regarding his conduct clearly established that Father has been beholden to Mother for the necessities of his daily life. As a result, he has continued to enable Mother's addictive behaviors. Father has no means to afford independent housing, and he remains a resident of Mother's home. Father does not have a source of income independent of Mother by which to provide for his children's basic needs. (N.T. 8/19/15, p. 91).

Ms. Mullen testified as follows:

> My biggest concern is that [Father] continues to exhibit the same pattern of behavior of hiding [Mother's] drinking until it gets to some kind of crisis level. That he still remains living in the home with [Mother]. And [Father] doesn't have any means to parent the children independently. He does not have housing. He doesn't have a source of income to be able to provide for his children's basic needs.

(N.T. 8/19/15, p. 71).

13

When detailing the history of Father's drug addiction, the history of domestic violence between Father and Mother, and the lengthy continued instability of their relationship and their household, Ms. Mullen's testimony was credible, compelling and convincing. While circumstantial in certain regards, when considered in its totality (and most poignantly recognizing Father's admission of his own inability to adequately parent the Children), we found the evidence clear and convincing that Father is unable to provide an environment of safety and stability for the Children. (N.T. 2/16/18, pp. 110-111).

The record reveals a concerted attempt by both parents to portray the Agency as biased and motivated by a vendetta against their reunification with Children. This theme includes the suggestion that Ms. Mullen's continued role as Agency caseworker for this family, even after being promoted to an Agency supervisor, was due to her desire to maintain some sort of vindictive campaign against these parents. Upon consideration of the testimony and evidence presented, we find this assertion meritless.

Ms. Mullen testified credibly about the voluminous Agency files regarding these parents, which are the result of a long history between the Agency and this family. Ms. Mullen was promoted in June 2015 and the termination hearing was originally scheduled to begin in August 2015. She had already begun preliminary preparations for the hearing. Additionally, it would have been unfair and perhaps unreasonable, to expect a newly assigned caseworker to become sufficiently familiar with this complex case in order to be properly prepared to testify in court. (N.T. 2/16/16, pp. 107-109). We found Ms. Mullen's testimony credible, and her efforts here demonstrated an admirable work-ethic.

As is his right, Father did not testify at these hearings. Nor did he present any witnesses on his behalf. We reference below a portion of the testimony presented by Mother, only to the extent it is relevant to both parents.

We heard the testimony of Lois Pfender, who is employed by the Family Services Association of Bucks County. Following a referral by the Agency, Ms. Pfender provided

14

occasional services to the parents as a parent educator from March 2014 to December 2014. (N.T. 2/18/16, pp. 172, 177). "[W]e talked about basics. Sleep, nutrition, attachment, discipline, safety, dealing with stress, the child's self-esteem. I think we talked about potty-training a little bit. That type of basic parenting things." (N.T. 2/18/16, p. 174). Ms. Pfender testified that both parents completed the parenting sessions. (N.T. 2/18/16, pp. 173-174, 184).

We also heard the testimony of Jill Klein, who has a Master's Degree in Pastoral Counseling, and who counseled Mother and Father from August 2010 to May 2012. The "couples counseling" was "closed-out" in November 2014. Ms. Klein resumed counseling the parents in July 2015. She continues to provide them with counseling "depending on their schedule and my schedule, then the need, their need." (N.T. 2/18/16, pp. 188, 196). Ms. Klein testified that she has counseled the parents on marital issues such as trust and communication, and that the counseling issues between the parents have not changed since the parents divorced in February, 2015. (N.T. 2/18/16, pp. 188, 209). "Honestly, it doesn't seem like the relationship with them being divorced is much different than when they weren't divorced." (N.T. 2/18/16, p. 209). Ms. Klein was aware that Father has continued to live in Mother's home, post-divorce, but she was not aware of whether Father and Mother continue to share the same room or same bed. (N.T. 2/18/16, p. 210). Significantly, Ms. Klein had no knowledge or information about the parents' alcohol or drug issues. (N.T. 2/18/16, p. 188).

15

## C. Termination of Father's Parental Rights Pursuant to §2511(a)

Decisional law mandates that this Court evaluate the individual circumstances of a case, and consider all explanations offered by the parent facing termination of his or her parental rights when determining if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination. In re R.I.S. & A.I.S., 36 A.3d 567, 572 (Pa. 2011); In re B.N.M. 856 A.2d 847, 856 (Pa. Super. 2004), appeal denied, 872 A.2d 1200 (Pa. 2005). We have undertaken this mandated evaluation with great care in this case.

Based on the evidence and testimony provided regarding Father's circumstances, and in accordance with pertinent statutory law, we found that the record clearly and convincingly establishes that the Children have lacked proper parental care and control necessary for their well-being pursuant to §2511(a)(2). We also determined that Father has not, cannot, and will not remedy those parental incapacitating conditions within a reasonable time period.

The Agency was able to clearly and convincingly establish, pursuant to §2511 (a)(5), that the Children have been in care for six (6) months or more, that the reasons for such placement continue to exist, and that those reasons are not likely to be remedied within a reasonable time. At the hearing on August 19, 2015, the Agency's Exhibit CY-1 was admitted into evidence. The Exhibit, a bar graph, was a compelling demonstration of the age, calculated by number of months, of each child as of that date, with computations of the respective number of months each child had been in the care of the parents versus in the care of the Agency. A.M.H. had been alive for one hundred three (103) months, had been in the care of his parents for fifty-six (56) months, and had been out of the care of his parents for forty-seven (47) months. M.R.H. had been alive for ninety-two (92) months, had been with his parents for forty-five (45) months, and had been in out- of-home placement for forty-seven (47) months. A.N.H. had been alive for eighty (80) months at that time. She had never been in the care of her paternal grandparents and had only been in the out-of-home care of her maternal grandmother. She had been with her parents for thirty-six (36) months and had been in the care of her grandmother for

16

forty-four (44) months. As of the August 19, 2015 hearing, L.N.H. had been alive for forty-five (45) months, had been in the care of her parents for fifteen (15) months, and had been in the care of her maternal grandmother for thirty (30) months. S.N.H. had been alive for twenty-one (21) months, had been in the care of her parents for one (1) month, and had been in the care of her maternal grandmother for twenty (20) months. (N.T. 8/19/15, pp. 12-16).

Finally, pursuant to §2511(a)(8), the Agency met its burden of demonstrating that the Children have been in its care for at least twelve (12) months, as placement with the Agency with respect to each child has been fully detailed, *infra*.[7]

Upon consideration of the full record, the testimony was clear and convincing that Father has been, and continues to be, unable to adequately parent the Children. He has no independent source of income, and no housing of his own. Father is fully beholden to Mother, and he has no means of providing for these five (5) Children. While Father has failed to admit that he has continued to enable Mother's substance abuse, we credit Father with his realization and admission that he is unable to independently parent the Children.

### D. Termination of Father's Parental Rights Pursuant to §2511(b)

As the Agency clearly and convincingly established the criteria for termination of parental rights as set forth by 23 Pa.C.S.§2511(a)(2), (5), and (8),[8] this Court next examined, pursuant to §2511(b), whether upon consideration of the developmental, physical, and emotional needs and welfare of the Children, the termination of Father's parental rights serves their best interests. We have concluded that the Agency clearly and convincingly established these criteria as well.

We heard credible testimony from and about Ms. Duvak, the maternal grandmother who has been the foster parent to her grandchildren for various times during the past nine (9) years,

---

[7] Pursuant to § 2511 (a) (8), the Agency need not prove that the conditions leading to out-of-home placement cannot be remedied within a reasonable period of time.

[8] The Superior Court need only agree with the trial court's conclusions regarding any one subsection of § 2511(a) in order to affirm the termination of parental rights. In re S.C.B., 990 A.2d 762, 770 (Pa. Super. 2010).

17

and consistently since February, 2013.[9] Ms. Duvak has maintained her willingness to be an adoptive resource for the Children. She is sixty-two (62) years old and is employed, full-time, as a certified registered nurse practitioner. At great sacrifice, she has willingly opened her heart and home to provide her five (5) grandchildren with permanence and stability because their parents have not been able to do so. (N.T. 8/19/15, p. 73; 2/18/16, p. 7)

Ms. Mullen has observed the Children in Ms. Duvak's home. Ms Mullen testified about the Children's loving bond with their grandmother, who has provided a stable home and normal routine to their lives. (N.T. 8/19/15, pp. 71-72). Ms. Mullen described how the Children love to eat dinner together with Ms. Duvak, how close the two oldest boys are, and how the younger girls follow right behind their older sister. She observed that the Children are healthy, happy and excelling in school. Ms. Mullen testified credibly that despite suggestions to the contrary by the parents, Ms. Duvak, at her age and stage in life, has no interest in "stealing" the Children from their parents and raising five (5) children, all of whom are under ten (10) years of age. (N.T. 8/19/15, p. 73). It is only because the parents have not been able to safely provide for and protect the Children that Ms. Duvak decided to do what was best for the Children. She has been an ongoing resource for meeting their needs. (N.T. 8/19/15, pp. 72-73).

Based on the above, we found the evidence of the Children's substantial bond with their foster/maternal grandmother, to be clear and convincing.

When considering what situation would best serve a child's needs and welfare, the trial court must examine the status of the natural parental bond. In re Z.P., supra., 994 A.2d at 1121. The Superior Court has described the bonding analysis required of the trial court as follows:

> When conducting a bonding analysis, the court is not required to use expert testimony. ..Social workers and caseworkers can offer evaluations as well... Additionally, Section 2511(b) does not require a formal bonding evaluation... "Above all else ... adequate consideration

---

[9] As noted, one month after the youngest child was born in November, 2013, she was placed in the care of Ms. Duvak, where she has remained to this day.

18

must be given to the needs and welfare of the child.".... A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. ..

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the *intangible* dimension of the needs and welfare of a child—the love, comfort, security, and closeness— entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

Id. (internal citations omitted)

In this matter, this Court determined that termination was warranted. Father has admitted that he does not have the means to adequately parent his Children. Father has admitted a drug addiction, a lack of income independent of Mother, and Father continues to live in Mother's home, despite the February 2015 divorce. It is unclear to the Agency what relationship the parents presently maintain, however it is overwhelmingly clear that Mother controls Father and he is fully dependent upon her. From the testimony of Ms. Klein, we learned that parents' volatile relationship has not changed post-divorce and that Father and Mother continue to battle the same issues.

The record contains clear and convincing evidence that Father is incapable of adequately parenting the Children.[10] We do not doubt that Father loves his Children. However, when Father's repeated failure to remedy his parental incapacity and his substantial noncompliance with reasonable Agency objectives is balanced against the Children's need for permanence and stability, this Court has concluded that it would not be in the Childrens' best interests for their lives to remain on hold indefinitely, in hopes that Father will one day be able to act responsibly and consistently as their parent. *See* In re Adoption of C.D.R., 111 A.3d 1212,

---

[10] The record is devoid of persuasive testimony or evidence of the existence of a necessary and beneficial relationship between Father and the Children, the termination of which would result in a negative effect on the Children.

19

1220 (Pa. Super. 2015)(internal citations omitted). Regrettably, then, Father is not entitled to relief.

## VI. CONCLUSION

For all of the reasons noted above, we respectfully submit that our Decree of June 30, 2016, granting the Agency's Petition to Involuntarily Terminate Father's Parental Rights as to the Children, should be affirmed.

BY THE COURT:

9/13/16
Date

GARY B. GILMAN

N.B. It is your responsibility to notify all interested parties of the above action.

20